**NOT FOR PUBLICATION**

## UNITED STATES DISTRICT COURT
## FOR THE DISTRICT OF NEW JERSEY

| | |
|---|---|
| In re DIRECT PURCHASER INSULIN PRICING LITIGATION, | Case No. 3:20-cv-3426 (BRM) (LHG)<br><br>**OPINION** |
| ROCHESTER DRUG CO-OPERATIVE, INC., *et al.*,<br><br>Plaintiffs,<br><br>v.<br><br>ELI LILLY AND COMPANY, *et al.*,<br><br>Defendants. | |

**MARTINOTTI, DISTRICT JUDGE**

Before this Court are two Motions to Dismiss. The first motion is Defendants Eli Lilly and Company ("Eli Lilly"), Novo Nordisk, Inc. ("Novo"), and Sanofi-Aventis U.S. LLC's ("Sanofi") (collectively, the "Manufacturer Defendants") Motion to Dismiss Plaintiffs' FWK Holdings, LLC ("FWK") and Professional Drug Company, Inc.'s ("PDC") (together, "Plaintiffs") Amended Complaint pursuant to Federal Rules of Civil Procedure 12(b)(1) and (6). (ECF No. 130.) The second motion is Defendants OptumRx, Inc., Optum, Inc., OptumRx Holdings, LLC, United Healthcare Services Inc., United Health Group Incorporated, CVS Health Corporation, CaremarkPCS Health LLC, Caremark LLC, Caremark RX LLC, Express Scripts Holding Company, Express Scripts Inc., and Medco Health Solutions, Inc.'s (collectively, the "PBM Defendants") (together, with the Manufacturer Defendants, "Defendants") Motion to Dismiss

Plaintiff's Amended Complaint pursuant to Rule 12(b)(6). (ECF No. 131.) Plaintiffs opposed the Manufacturer Defendants and the PBM Defendants' Motions in a single opposition brief. (ECF No. 139.) The Manufacturer Defendants (ECF No. 145) and the PBM Defendants (ECF No. 146) both replied.

Having reviewed the parties' submissions filed in connection with the Motions and having declined to hold oral argument pursuant to Federal Rule of Civil Procedure 78(b), for the reasons set forth below and for good cause shown, the Manufacturer Defendants' Motion to Dismiss (ECF No. 130) is **GRANTED IN PART and DENIED IN PART**, and the PBM Defendants' Motion to Dismiss (ECF No. 131) is **GRANTED IN PART and DENIED IN PART**.

## I.    BACKGROUND[1]

### A.    Diabetes and Analog Insulins

Plaintiff's Amended Complaint concerns "the marketing, pricing, sale and distribution of . . . long-acting analog insulin[]" drugs for the treatment and management of diabetes. (ECF No. 112 ¶ 2.)

"Diabetes is an increasingly common disease in the U.S. that occurs in patients who have a lack of insulin production or an inability to respond to insulin." (*Id.* ¶ 41.) "As of 2020, more than 34 million people in the U.S. had Type 1 or Type 2 diabetes." (*Id* ¶ 43.) A necessary and common treatment to combat diabetes is insulin therapy (*id.* ¶ 44), which "enables cells in the body to absorb glucose from the blood" (*id.* ¶ 42). "Analog insulin is a subgroup of human insulin," and "is laboratory grown but genetically altered to create either a more rapid-acting or more uniformly-acting form of insulin." (*Id.* ¶ 45.) Analog insulins are preferred for diabetes treatment "because

---

[1] For the purposes of the Motions to Dismiss, the Court accepts the factual allegations in the Amended Complaint as true and draws all inferences in the light most favorable to Plaintiffs. *See Phillips v. Cnty. of Allegheny*, 515 F.3d 224, 228 (3d Cir. 2008).

they more closely mimic the way the human body naturally absorbs insulin released by the pancreas" and, therefore, "provide increased treatment options." (*Id.* ¶ 46; *id.* ¶ 50 (noting that analog insulins are "generally considered to be therapeutically interchangeable").) Consequently, analog insulins dominate the insulin market. (*Id.* ¶ 45.)

### B.    The Parties

The Manufacturer Defendants—Eli Lilly, Novo, and Sanofi—are medical drug corporations and LLCs that, during the relevant class period, manufactured and sold analog insulin drugs to purchasers in New Jersey and throughout the United States. (*Id.* ¶¶ 17–19.) Eli Lilly manufacturers and sells the analog insulin Humalog (*id.* ¶ 18), Novo manufacturers and sells the analog insulins NovoLog and Levemir (*id.* ¶ 17), and Sanofi manufactures and sells the analog insulin Lantus (*id.* ¶ 19).[2] According to Plaintiff, 2016 data shows that the Insulin Drugs were among the top-selling insulins in the United States: "Lantus ($8.87 billion); Levemir ($1.82 billion); NovoLog ($5.86 billion); and Humalog ($5.88 billion)." (*Id.* ¶ 49.) The PBM Defendants are pharmacy benefit managers ("PBMs") that, during the relevant class period, "contract[ed] on behalf of health benefit providers with Novo, Eli Lilly, and Sanofi for purchase of the analog insulin medications these drug companies make." (*Id.* ¶¶ 20, 27, 35.)[3] The PBM Defendants are three of the largest PBMs in the country, controlling over 75% of covered individuals. (*Id.* ¶¶ 63–64.)

---

[2] Throughout this Opinion, Humalog, Novolog, Levemir, and Lantus are, collectively, the "Insulin Drugs."

[3] Included within the PBM Defendants are three PBMs and their subsidiaries. This includes (1) Defendant CVS Health Corporation and its subsidiaries Defendants Caremark PCS Health, LLC, Caremark, LLC, and Caremark LLC (collectively, "CVS Health") (*id.* ¶¶ 20–25); (2) Defendant Express Scripts Holding Company and its subsidiaries Defendants Express Scripts, Inc. and Medco Health Solutions, Inc. (collectively, "Express Scripts") (*id.* ¶¶ 26–30); and (3) Defendant United Health Group, Inc. and its subsidiaries Defendant United Healthcare Services, Inc., Optum, Inc., OptumRx Holdings, LLC, and OptumRx, Inc. (collectively, "OptumRx") (*id.* ¶¶ 31–36).

Plaintiff FWK is an Illinois LLC and assignee of the antitrust and other claims of Frank W. Kerr Co. (*Id.* ¶ 12.) During the relevant class period, "FWK purchased approximately: (i) $113,143,774.13 of Lantus directly from Defendant Sanofi, (ii) $25,455,136.10 of Levemir and $64,418,385.92 of Novolog directly from Defendant Novo, and (iii) $45,419,536.95 of Humalog directly from Defendant Eli Lilly." (*Id.* ¶ 13.) Plaintiff PDC is a Missouri corporation which, during the relevant class period, "purchased Lantus directly from Defendant Sanofi and purchased Levemir directly from Defendant Novo." (*Id.* ¶¶ 14–15.) Plaintiffs seek damages (*id.* at 99) on behalf of two direct purchaser classes (the "Direct Purchaser Classes"):

> (1) all persons or entities that directly purchased NovoLog and/or Humalog from Defendants Eli Lilly and Company and Novo Nordisk Inc. in the U.S. and its territories, from January 1, 2009 through the present; and

> (2) all persons or entities that directly purchased Lantus and/or Levemir from Defendant Sanofi-Aventis U.S., LLC and Novo Nordisk Inc. in the U.S. and its territories, from January 1, 2009 through the present.

> Excluded from the Class are Defendants and their officers, directors, management, employees, subsidiaries, or affiliates, and all governmental entities.

(*Id.* ¶ 177.)

### C.     PBMs and Formularies

According to Plaintiffs, "[t]he critical players in the prescription drug industry include drug companies (*i.e.*, manufacturers), direct purchasers (usually wholesalers like Plaintiffs), pharmacies, health benefit providers (such as institutional insurers, self-insured employers, and health and welfare plans), PBMs, and patient-consumers." (*Id.* ¶ 55.) Following production, drug companies and manufacturers sell their drugs to distributors and other direct purchasers. (*Id.*

¶¶ 56–57.) Prices during these sales are set by the drug company and related to the drug's "wholesale acquisition cost" ("WAC"). (*Id.* ¶ 57.)

"PBMs effectuate financial and contractual arrangements" on behalf of their clients, health benefit providers. (*Id.* ¶ 60.) Among the services PBMs provide to their clients is negotiating prices with drug companies. (*Id.*) During such negotiations, "PBMs typically select one brand among several brand drugs in a therapeutic class as the 'preferred' choice and then negotiate payments from that manufacturer called 'rebates.'" (*Id.* ¶ 61.) "So long as those rebates are passed back to the client, this rebate system could lower the net cost of that brand to health benefit providers." (*Id.*) Another service PBMs provide to their clients is "creating and managing formularies." (*Id.* ¶ 60.) "Formularies are a central tool that health benefit providers use in designating, managing, and publicly identifying the extent of the coverage and benefits they provide to the members." (*Id.* ¶ 68.) In general, a formulary is a list of preferred drugs "covered and prescribed for purchase" in a particular benefit plan. (*See id.* ¶ 236; *see also id.* ¶ 79.) "Because formulary coverage impacts how much a patient pays for a drug, formularies can be used to steer patients toward certain drugs over others . . . ." (*Id.* ¶ 68.)

Many PBMs, including the PBM Defendants, have contractual authority to make day-to-day changes to their clients' formularies. (*Id.* ¶ 69; *see also id.* ¶ 70 (alleging that most health benefit providers rely upon a PBM's formulary recommendations).) In the past, PBMs generally used "open" formularies which offered "varying degrees of plan coverage and benefits for virtually all available FDA-approved drugs." (*Id.* ¶ 73.) In an open formulary, "drug companies [would therefore] compete to have their drugs placed by PBMs into the most favorable formulary tier as possible." (*Id.*) In recent years, however, PBMs, including the PBM Defendants, began using "closed" formularies for their clients. (*Id.* ¶ 75.) In a closed formulary, "the overall number of drugs that are entitled to receive any plan prescription drug benefit" is restricted, thereby

preventing, as had been done in open formularies, the inclusion of all available, FDA-approved drugs. (*Id.* ¶ 74.) Therefore, closed formulary placement today is increasingly important for drug manufacturers, "because favorable formulary status is likely to increase (or at least maintain) a drug's usage and sales," while "formulary exclusion (or a downgrade in formulary position) is likely to reduce a drug's usage and sales." (*Id.* ¶ 72.)

Drug "manufacturers pay rebates based on the PBMs['] . . . ability to deliver formulary placement for their drugs." (*Id.*) In situations in which "several products may be considered therapeutically equivalent, PBMs can negotiate with drug companies for higher rebates." (*Id.* ¶ 77.) Formulary placement, therefore, has become a "major factor" in negotiations between PBMs and drug companies "for rebates and other types of payments." (*Id.* ¶ 77.) Plaintiffs note industry experts have expressed concerns over the power PBMs wield (*id.* ¶¶ 79–80) and federal and state governments have begun investigating insulin prices and rebates (*see generally id.* ¶¶ 81–87).

### D.    Plaintiffs' Allegations

Plaintiffs' Amended Complaint concerns payments—allegedly constituting bribes and kickbacks—from the Manufacturer Defendants to the PBM Defendants for the formulary placement of the Insulin Drugs. (*Id.* ¶ 3.) According to Plaintiffs, Defendants' kickback scheme can be described as follows. The "PBM Defendants generally pass through only a portion of specified 'rebates' they demanded from drug manufacturers to [their] health benefit provider clients." (*Id.* ¶ 88.) For example, the PBM Defendants "have written their contracts to retain for themselves all other payments from drug companies like the Manufacturer Defendants" for, *inter alia*, "discounts, 'administrative or other fees,' and/or side deals," thereby allowing "the PBM Defendants [to] keep substantially more of the moneys received from drug makers than they pass through" and "profit handsomely." (*Id.*) Therefore, if the PBM Defendants "enter[] into contracts with drug companies and choose[] to give rebates another name—like administrative fees or health

management fees or grants—[they] will arguably eliminate its obligation to pass through the financial benefits to its clients." (*Id.* ¶ 91 (citation omitted).) Furthermore, "[a]dministrative fees can make up a substantial portion of the total dollar amount of drug company payments to a PBM." (*Id.* ¶ 95 (citing (1) Senate testimony alleging "administrative fees can amount to 25-30% of total payments from drug companies" and (2) revelations from a 2017 lawsuit indicating Defendant Express Scripts "kept 13 times more in administrative fees than it passed to its clients through 'rebates'"); *see also id.* ¶ 98 ("Thus, over a four-year period, . . . PBM revenues virtually doubled (from $11.6 billion to $22.4 billion) because PBMs retained more and more manufacturer rebates and fees (which are not shared with health benefit provider clients) virtually tripled.").) Plaintiffs maintain "the hard bargains the PBM Defendants purport to drive their clients are, in reality, for the benefit of the PBM Defendants themselves." (*Id.* ¶ 99.)

"In addition to rebates, drug companies like the Manufacturer Defendants often pay [the] PBM Defendants substantial amounts of 'administrative fees' in exchange for, among other things, ensuring a given drug's formulary placement." (*Id.* ¶ 90; *see also id.* ¶ 94 ("Thus, . . . PBMs are demanding and drug companies are paying what are labeled administrative fees (which do not flow to the health benefit providers to any significant extent) to PBMs in exchange for formulary placement.").) According to Plaintiffs,

> [t]hese rebates and fees solicited by the PBM Defendants and paid to them by the Manufacturer Defendants . . . were payments other than for services rendered, i.e., commercial bribes and kickbacks, and constituted a breach of the fiduciary duty owed by the PBM Defendants to their clients. Thus, in purpose and effect these rebates and payments of fees constituted commercial bribery through unlawful kickbacks.

(*Id.* ¶ 100.) Plaintiffs assert the "kickbacks were and continue to be paid from the difference between the Defendants' published WAC prices and the net selling prices secretly agreed upon by the Manufacturer Defendants and the PBMs." (*Id.* ¶ 101.)

Plaintiffs also allege the prices they and the Direct Purchaser Classes paid for the Insulin Drugs were "artificially inflated" because of Defendants' kickback scheme. (*Id.*) Plaintiffs maintain, "[i]n a well-functioning, competitive market," the PBM Defendants would use their power to negotiate lower prices. (*Id.* ¶ 105.) "In turn, the Manufacturer Defendants would compete by providing the lowest price in order to obtain a favorable position on the formulary." (*Id.* ¶ 106.) However, "the PBM Defendants benefit from higher WAC prices because it results in higher rebate and fee payments that they keep for themselves." (*Id.* ¶ 108; *see also id.* ¶ 109 (noting that kickbacks "are usually calculated as a percentage of the dollar value of a drug's usage based on its WAC list price"); *id.* ¶ 110 (further noting that "the PBM Defendants benefit from large, annual list price increases by drug companies that occur during the life of a multi-year contract").) Consequently,

> [t]his has created a perverse incentive for: (a) the PBM Defendants to give preferential formulary status to higher-priced drugs which come with higher payments to the PBMs, even if doing so is contrary to the health plan clients' interest in favoring lower-priced drugs; and (b) for drug companies such as the Manufacturer Defendants to use high rebate and fee payments to purchase favorable formulary status from [the] PBM Defendants, instead of trying to ensure favorable formulary status by lowering list prices or limiting list price increases.

(*Id.* ¶ 113.)

Plaintiffs also allege the recent increases in drug list prices "are directly tied to—and the result of—the bribes and kickbacks to [the] PBM Defendants." (*Id.* ¶ 116 ("The reason drugmakers sharply raise list prices without a corresponding increase in net price is that PBMs demand higher rebates in exchange for including the drug on their preferred-drug lists."); *id.* ¶ 117 (citing a 2016 open letter from Novo stating "we would continue to increase the list [price] in an attempt to offset the increased rebates, discounts and price concessions to maintain a profitable and sustainable business"); *see also id.* ¶¶ 118–19.) Included within these recent price increases were the prices of

the Insulin Drugs, which have increased since 2012. (*Id.* ¶ 120; *see also id.* ¶¶ 121–23.) This increase, however, "cannot be explained by normal competitive forces" (*id.* ¶ 126), as "the clinical benefits of these medications have not changed for many years" (*id.* ¶ 125). Rather, Plaintiffs maintain the cause of the increases has been Defendants' unlawful kickback scheme. (*Id.* ¶ 127.)

Throughout the relevant class period, Defendants agreed "to increase pricing and restrain competition for the sale of the Insulin Drugs in the U.S." (*Id.* ¶ 127.) Defendants used annual conferences, forums, and meetings to facilitate and maintain their agreement and scheme. (*See generally id.* ¶¶ 130–134; *see also id.* ¶ 135 ("Defendants' attendance at the above conferences allowed for face-to-face meetings between Defendants and thus opportunities for communications between Defendants relating to bids and pricing strategy."); *id.* ¶ 137 ("The Manufacturer Defendants raised the Insulin Drugs' prices within about one or two months after the above conferences and meetings.").)

Plaintiffs, therefore, seek damages (*id.* at 99) on behalf of two direct purchaser classes:

> (1) all persons or entities that directly purchased NovoLog and/or Humalog from Defendants Eli Lilly and Company and Novo Nordisk Inc. in the U.S. and its territories, from January 1, 2009 through the present; and
>
> (2) all persons or entities that directly purchased Lantus and/or Levemir from Defendant Sanofi-Aventis U.S., LLC and Novo Nordisk Inc. in the U.S. and its territories, from January 1, 2009 through the present.
>
> Excluded from the Class are Defendants and their officers, directors, management, employees, subsidiaries, or affiliates, and all governmental entities.

(*Id.* ¶ 177.) Plaintiffs allege the following causes of action: (1) Count One for violation of the Robinson-Patman Act, 15 U.S.C. § 13(c), against all Defendants (*id.* ¶¶ 190–99); (2) Count Two for violation of the Sherman Act, 15 U.S.C. § 1, against the Manufacturer Defendants (*id.* ¶¶ 200–10); (3) Count Three for conspiracy to violate the Sherman Act against all Defendants (*id.* ¶¶ 211–

22); (4) Count Four for violation of the Racketeer Influenced and Corrupt Organizations Act ("RICO"), 18 U.S.C. § 1962(c), against all Defendants (*id.* ¶¶ 223–78); and (5) Count Five for conspiracy to violate RICO (*id.* ¶¶ 279–86).

### E.    Procedural History

Plaintiff Rochester Drug Co-Operative, Inc. ("Rochester") filed the Original Complaint in this matter against Defendants on March 31, 2020. (ECF No. 1.) On September 22, 2020, the Court consolidated this matter with the proceedings entitled *FWK Holdings, LLC v. Novo Nordisk, et al.*, Civ. A. No. 20-3480[4] and *Value Drug Company v. Eli Lilly and Company, et al.*, Civ. A. No. 20-5129.[5] (ECF No. 99.)[6] The Court also ordered the consolidated plaintiffs "to meet and confer and file a single operative complaint in Civil Action No. 20-3426 by November 6, 2020." (*Id.* at 4.) On October 30, 2020, Rochester and Value voluntarily dismissed their actions. (ECF No. 110.) On November 2, 2020, the Court entered an Order of Voluntary Dismissal dismissing their actions. (ECF No. 111.)

On November 6, 2020, Plaintiffs filed the present five-count Amended Complaint against Defendants. (ECF No. 112.) On January 13, 2021, the Manufacturer Defendants filed a Motion to Dismiss Plaintiffs' Amended Complaint pursuant to Rules 12(b)(1) and (6). (ECF No. 130.) Also on January 13, 2021, the PBM Defendants filed a Motion to Dismiss pursuant to Rule 12(b)(6). (ECF No. 131.) On March 15, 2021, Plaintiffs filed a single opposition to the Manufacturer

---

[4] Civil Action No. 3480 was brought by FWK, Plaintiff in the present matter. (*See* Compl., ECF No. 1, 3:20-cv-3480 (BRM) (LHG)).)

[5] Civil Action No. 20-5129 was brought by Value Drug Company ("Value"). (*See* Compl., ECF No. 1, 3:20-cv-5129 (BRM) (LHG)).)

[6] Like Rochester's Original Complaint, Civil Action Nos. 20-3480 and 20-5129 involved "similar allegations of price fixing relating to the benchmark prices of various analog insulins, [as well as] many of the [same] parties." (*Id.* at 2.)

Defendants and PBM Defendants' Motions to Dismiss. (ECF No. 139.) On April 26, 2021, both the Manufacturer Defendants (ECF No. 145) and PBM Defendants (ECF No. 146) replied.

## II.   LEGAL STANDARD

### A.   Rule 12(b)(6)

In deciding a motion to dismiss pursuant to Federal Rule of Civil Procedure 12(b)(6), a district court is "required to accept as true all factual allegations in the complaint and draw all inferences in the facts alleged in the light most favorable to the [plaintiff]." *Phillips v. Cnty. of Allegheny*, 515 F.3d 224, 228 (3d Cir. 2008). "[A] complaint attacked by a Rule 12(b)(6) motion to dismiss does not need detailed factual allegations." *Bell Atl. Corp. v. Twombly*, 550 U.S. 544, 555 (2007) (citations omitted). However, the plaintiff's "obligation to provide the 'grounds' of [her] 'entitle[ment] to relief' requires more than labels and conclusions, and a formulaic recitation of the elements of a cause of action." *Id.* (citing *Papasan v. Allain*, 478 U.S. 265, 286 (1986)). Moreover, assuming the factual allegations in the complaint are true, those "[f]actual allegations must be enough to raise a right to relief above the speculative level." *Twombly*, 550 U.S. at 555.

"To survive a motion to dismiss, a complaint must contain sufficient factual matter, accepted as true, to 'state a claim for relief that is plausible on its face.'" *Ashcroft v. Iqbal*, 556 U.S. 662, 678 (2009) (citing *Twombly*, 550 U.S. at 570). "A claim has facial plausibility when the pleaded factual content allows the court to draw the reasonable inference that the defendant is liable for misconduct alleged." *Id.* This "plausibility standard" requires the complaint allege "more than a sheer possibility that a defendant has acted unlawfully," but it "is not akin to a 'probability requirement.'" *Id.* (quoting *Twombly*, 550 U.S. at 556). "Detailed factual allegations" are not required, but "more than an unadorned, the defendant-harmed-me accusation" must be pled; it must include "factual enhancements" and not just conclusory statements or a recitation of the elements of a cause of action. *Id.* (citing *Twombly*, 550 U.S. at 555, 557).

"Determining whether a complaint states a plausible claim for relief [is] . . . a context-specific task that requires the reviewing court to draw on its judicial experience and common sense." *Iqbal*, 556 U.S. at 679. "[W]here the well-pleaded facts do not permit the court to infer more than the mere possibility of misconduct, the complaint has alleged—but it has not 'show[n]'—'that the pleader is entitled to relief.'" *Id.* at 679 (quoting Fed. R. Civ. P. 8(a)(2)). However, courts are "not compelled to accept 'unsupported conclusions and unwarranted inferences,'" *Baraka v. McGreevey*, 481 F.3d 187, 195 (3d Cir. 2007) (quoting *Schuylkill Energy Res. Inc. v. Pa. Power & Light Co.*, 113 F.3d 405, 417 (3d Cir. 1997)), nor "a legal conclusion couched as a factual allegation." *Papasan*, 478 U.S. at 286.

While, as a general rule, the court may not consider anything beyond the four corners of the complaint on a motion to dismiss pursuant to Rule 12(b)(6), the Third Circuit has held that "a court may consider certain narrowly defined types of material without converting the motion to dismiss [to one for summary judgment pursuant to Rule 56]." *In re Rockefeller Ctr. Props. Sec. Litig.*, 184 F.3d 280, 287 (3d Cir. 1999). Specifically, courts may consider any "document *integral to or explicitly relied* upon in the complaint." *In re Burlington Coat Factory Sec. Litig.*, 114 F.3d 1410, 1426 (3d Cir. 1997) (quoting *Shaw v. Dig. Equip. Corp.*, 82 F.3d 1194, 1220 (1st Cir. 1996)).

**B.      Rule 9(b)**

Pursuant to Federal Rule of Civil Procedure 9(b), when alleging fraud, "a party must state with particularity the circumstances constituting fraud or mistake, although intent, knowledge, and other conditions of a person's mind may be alleged generally." *In re Lipitor Antitrust Litig.*, 868 F.3d 231, 249 (3d Cir. 2017) (citations omitted); *see also U.S. ex rel. Moore & Co., P.A. v. Majestic Blue Fisheries, LLC*, 912 F.3d 294, 307 (3d Cir. 2016) (holding that a "plaintiff alleging fraud must . . . support its allegations with all of the essential factual background that would accompany the first paragraph of any newspaper story—that is the who, what, when, where and how of the

events at issue") (citations omitted). Accordingly, "a party must plead [its] claim with enough particularity to place defendants on notice of the 'precise misconduct with which they are charged.'" *U.S. ex rel. Petras v. Simparel, Inc.*, 857 F.3d 497, 502 (3d Cir. 2017) (quoting *Lum b. Bank of Am.*, 361 F.3d 217, 223–24 (3d Cir. 2004), *abrogated on other grounds by Twombly*, 550 U.S. at 557).

## III. DECISION

### A.  Count One: Violation of the Robinson-Patman Act

Count One of Plaintiffs' Amended Complaint alleges a violation Section 2(c) of the Robinson-Patman Act against Defendants. (*See* ECF No. 112 ¶¶ 190–99.) Section 2(c) states:

> It shall be unlawful for any person engaged in commerce, in the course of such commerce, to pay or grant, or to receive or accept, anything of value as a commission, brokerage, or other compensation, or any allowance or discount in lieu thereof, except for services rendered in connection with the sale or purchase of goods, wares, or merchandise, either to the other party to such transaction or to an agent, representative, or other intermediary therein where such intermediary is acting in fact for or in behalf, or is subject to the direct or indirect control, of any party to such transaction other than the person by whom such compensation is so granted or paid.

15 U.S.C. § 13(c). Plaintiffs assert Defendants' kickback scheme, in which the "PBM Defendants sought, and the Manufacturer Defendants paid, kickbacks, bribes and other unearned sums" amounts to commercial bribery under Section 2(c). (ECF No. 112 ¶¶ 192–93.) Plaintiffs maintain Defendants' unlawful conduct caused them to purchase the Insulin Drugs at inflated prices and "has resulted in competitive injury . . . by unduly restraining, hindering, suppressing and/or eliminating competition in the sale of commodities in interstate commerce." (*Id.* ¶¶ 195, 197; *see also id.* ¶ 198 ("As a direct and proximate result of Defendants' unlawful actions detailed herein, Plaintiffs have suffered substantial economic losses in the form of overcharges for the Insulin Drugs.").)

Defendants argue Plaintiffs lack associational standing to assert a Section 2(c) claim, "which 'is a threshold requirement in any antitrust case.'" (ECF No. 130-1 at 11 (quoting *Phila. Taxi Ass'n v. Uber Techs., Inc.*, 886 F.3d 332, 343 (3d Cir. 2018)); *see also* ECF No. 131-1 at 14–15.) Defendants assert antitrust injury for a Section 2(c) claim—a requirement for antitrust standing—generally requires a plaintiff to either (1) "be a direct competitor of a company that used a bribe to sell or purchase goods" or (2) "a principal whose agent breaches a fiduciary duty by taking a bribe during such a sale." (ECF No. 130-1 at 11–12; *see also* ECF No. 131-1 at 15.) The Manufacturer Defendants contend Plaintiffs—a drug wholesaler and an assignee of a defunct wholesaler—do not fall within either category and, accordingly, cannot establish Section 2(c) antitrust injury and standing. (ECF No. 130-1 at 12 ("They are not drug companies that compete with the Manufacturer Defendants for formulary status. Nor are they insurers that hire the PBM Defendants that receive the manufacturer rebates.").) The Court agrees.

Originally, "Congress enacted [S]ection 2(c), the Act's brokerage provision, primarily to curb one particular abuse by large chain store buyers, namely the use of 'dummy' brokerage fees as a means of securing rebates." *Env't Tectonis v. W.S. Kirkpatrick, Inc.*, 847 F.2d 1052, 1066 (3d Cir. 1988) (citation omitted). However, the Third Circuit has "since agreed that 'commercial bribery is [also] actionable under [Section] 2(c).'" *2660 Woodley Rd. Joint Venture v. ITT Sheraton Corp.*, 369 F.3d 732, 738 (3d Cir. 2004) (quoting *Env't Tectonics*, 847 F.2d at 1066). Moreover, although Section 2(c) outlines certain illegal conduct, *see* 15 U.S.C. 13(c), it does not create a private right of action. *2660 Woodley*, 369 F.3d at 738. "Rather, the private right of action for a § 2(c) Robinson-Patman claim, as for all private plaintiff antitrust rights of action, is provided by § 4 of the Clayton Act," *id.* (citation omitted), which states "[a]ny person who shall be injured in his business or property by reason of anything forbidden in the antitrust laws may sue therefore in any district court . . . in which the defendant resides or is found or has an agent." 15 U.S.C. § 15(a).

"However, in order to recover treble damages under § 4(a) of the Clayton Act," as Plaintiffs here seek to do, "a private plaintiff must do more than simply show 'an injury causally linked to' a violation of the antitrust laws." *2660 Woodley*, 369 F.3d at 738 (citing *Brunswick Corp. v. Pueblo Bowl-O-Mat, Inc.*, 429 U.S. 477, 489 (1977)). "A plaintiff must also prove 'antitrust injury, which is to say injury of the type the antitrust laws were intended to prevent and that flows from that which makes defendants' acts unlawful.'" *Id.* (quoting *J. Truett Payne Co. v. Chrysler Motors Corp.*, 451 U.S. 557, 568 (1981)). "[P]roof of an antitrust *injury* is only one of several components necessary to establish antitrust *standing*." *Cottman Transmission Sys., LLC v. Kershner*, 536 F. Supp. 2d 543, 558 (E.D. Pa. 2008) (emphasis added). "The Third Circuit has enumerated five factors that are relevant to whether a party has antitrust standing:"

> (1) the causal connection between the antitrust violation and the harm to the plaintiff and the intent by the defendant to cause that harm, with neither factor alone conferring standing; (2) whether the plaintiff's alleged injury is of the type for which the antitrust laws were intended to provide redress; (3) the directness of the injury . . . ; (4) the existence of more direct victims of the alleged antitrust violations; and (5) the potential for duplicative recovery or complex apportionment of damages.

*Id.* at 558–59 (quoting *Barton & Pittinos, Inc. v. SmithKline Beecham Corp.*, 118 F.3d 178, 181 (3d Cir. 1997)).

However, the Third Circuit has also "made it abundantly clear . . . that a cognizable antitrust injury is a necessary precursor to antitrust standing, regardless of whether other [of the above-mentioned] factors support such a finding." *McCullough v. Zimmer, Inc.*, 382 F. App'x 225, 230 (3d Cir. 2010) (citing *Barton*, 118 F.3d at 184 n.9). "Indeed, [the Third Circuit has] directed district courts to consider the threshold issue of antitrust injury at the outset, because '[i]f antitrust injury is not found, further inquiry is unnecessary.'" *Id.* (quoting *City of Pittsburgh v. W. Penn Power Co.*, 147 F.3d 256, 265 (3d Cir. 1998)). Here, Plaintiffs' antitrust injuries are the "significant

losses" they have and will continue to "sustain . . . in the form of artificially inflated prices paid for the Insulin Drugs." (ECF No. 112 ¶ 150.) The Third Circuit has held, however, "that paying inflated purchasing prices to vendors, without more, is [not] an injury of the type the antitrust laws were intended to prevent." *2660 Woodley*, 369 F.3d at 738 (internal quotation marks and citations omitted); *see also id.* ("The absence of such injury is fatal to [the plaintiffs'] attempt to establish antitrust standing.").

Moreover, even if the Court were to find Plaintiffs plausibly allege an antitrust injury and, therefore, reach the factors enumerated above, the outcome would remain the same. In particular, under factor four, "there are clearly 'more direct victims' of [Defendants'] alleged commercial bribery scheme." *2660 Woodley*, 369 F.3d at 742 ("Vendors who may have been prevented from selling goods to Hancock because they refused to participate in the SPR program of surcharges and rebates are far more direct victims of Sheraton's scheme than Hancock.") Competitors of the PBM Defendants and the Manufacturer Defendants, as well as the health benefit plan clients and their insured, make up these potential victims, not wholesalers like Plaintiffs. *See McCullough*, 382 F. App'x at 230 ("As noted above, the [plaintiffs] failed to plead a redressable antitrust injury because they were neither competitors nor consumers in the pertinent market.").

Accordingly, Defendants' Motions to Dismiss Count One of Plaintiff's Amended Complaint are **GRANTED**, and Count One is **DISMISSED WITHOUT PREJUDICE**.

### B.    Count Two: Violation of the Sherman Act

Count Two of Plaintiff's Amended Complaint alleges a violation of Section 1 of the Sherman Act against the Manufacturer Defendants. (ECF No. 112 ¶¶ 200–10.) Plaintiffs assert the "Manufacturer Defendants and their co-conspirators engaged in anticompetitive activities, the purpose and effect of which were to artificially fix, raise, maintain and/or stabilize the prices of the Insulin Drugs." (*Id.* ¶ 204.) According to Plaintiffs, the "Manufacturer Defendants agreed with

one another on the pricing of the Insulin Drugs in the U.S." (*id.* ¶ 207), thereby "depriv[ing] purchasers in the U.S. of price competition [while] providing pretextual justifications to purchasers and the public to explain any raises, maintenance or stabilization of the prices for the Insulin Drugs" (*id.* ¶ 204).

A plaintiff asserting a cause of action under Section 1 of the Sherman Act "must allege four elements: '(1) concerted action by the defendants; (2) that produced anti-competitive effects within the relevant product and geographic markets; (3) that the concerted actions were illegal; and (4) that it was injured as a proximate result of the concerted action.'" *Howard Hess Dental Labs. Inc. v. Dentsply Int'l, Inc.*, 602 F.3d 237, 253 (3d Cir. 2010) (quoting *Gordon v. Lewistown Hosp.*, 423 F.3d 184, 207 (3d Cir. 2005)). "Section 1 claims are limited to combinations, contracts, and conspiracies, and thus always require the existence of an agreement." *Id.* at 254 (citation omitted). Therefore, as a threshold requirement, "a plaintiff must plead 'some form of concerted action . . . , in other words, a unity of purpose or a common design and understanding or a meet of minds or a conscious commitment to a common scheme.'" *Lifewatch Servs. Inc. v. Highmark Inc.*, 902 F.3d 323, 333 (3d Cir. 2018) (quoting *In re Ins. Brokerage Antitrust Litig.*, 618 F.3d 300, 315 (3d Cir. 2010)). "An agreement may be shown by either direct or circumstantial evidence." *Id.* Where, as here (*see* ECF No. 139 at 37), a plaintiff sets forth circumstantial evidence of an agreement, it "must allege both parallel conduct and something 'more,' which we have sometimes called a 'plus factor.'" *Lifewatch*, 902 F.3d at 333 (citation omitted). Plus factors "could include evidence (1) 'that the defendant had a motive to enter into a . . . conspiracy,' (2) 'that the defendant acted contrary to its interests,' or (3) 'implying a traditional conspiracy.'" *Id.* (quoting *Ins. Brokerage*, 618 F.3d at 321–22).

The Manufacturer Defendants argue Plaintiffs' Amended Complaint "fails to plead 'parallel conduct' suggestive of a conspiracy." (ECF No. 130-1 at 19.) The Court agrees. In

particular, as the Manufacturer Defendants assert (*see id.* at 20 (citing ECF No. 112 ¶¶ 66, 72, 78–79), Plaintiffs' Amended Complaint contains several allegations that Eli Lilly, Novo, and Sanofi compete for—rather than conspire together to maintain—the respective prices of their analog insulins. For example, Plaintiffs include an April 2015 magazine article in which Express Scripts's Chief Medical Officer states the PBM told drug companies, "We're going to be pitting you all against each other. Who is going to give us the best price? If you give us the best price, we will move the market share to you. We will move it effectively. *We'll exclude the other products*." (ECF No. 112 ¶ 78 (emphasis added).) Furthermore, Plaintiffs cite to a February 2018 article in "a well-known publication focused on the life sciences and pharmaceutical industries" which notes the PBM Defendants' "enormous power over the availability and pricing of essential medicines" and asserts "[d]rug makers pay PBMs billions of dollars to ensure *their products* get preferred positions on formularies." (*Id.* ¶ 79 (emphasis added).) Parties with circumstantial evidence claims similar to Plaintiffs' have failed to move past the motion to dismiss stage. For example, *In re Allergan Erisa Litigation*, 975 F.3d 348, 350 (3d Cir. 2020) involved an employee savings and investment plan. Plaintiffs alleged their employer's "stock price was artificially inflated as a result of an illegal price-fixing conspiracy," but "the defendants, who [were] numerous individuals and entities responsible for administering or supervising the Company's benefit plans . . . took no action to prevent the plaintiffs from acquiring [the] stock at falsely inflated prices." *Id.* To demonstrate defendants were involved in such a conspiracy, the plaintiffs alleged:

> (i) the market for generic drugs is highly competitive; (ii) the prices for several generic drugs increased markedly over a brief period of time; (iii) certain members of Congress sought to investigate the increases; (iv) in connection with that investigation, [defendants were] asked to provide information about price increases for certain generic drugs it manufacturers; (v) several months later, [defendants] received a subpoena from the DOJ requesting information about the marketing and pricing of some of its generic products and communications with competitors regarding the same;

> and (vi) over a year after receiving the subpoena, the DOJ brought
> price-fixing charges against at least one unnamed party—but not
> [defendants]—related to generic drugs, and the DOJ was expected
> to remain active in pursuing generic-drug price fixing[.]

*Id.* at 353–54 (internal quotation marks and citation omitted). The Third Circuit held that, "[c]onsidered holistically, and taking all reasonable inferences in the plaintiffs' favor, [the] allegations fail[ed] to support a plausible inference that [defendants] conspired with other generic-drug manufacturers to fix prices." *Id.* at 354. Furthermore, the court noted "parallel price increases among competitors, without more, do not by themselves indicate the existence of an illegal conspiracy." *Id.* at 355.

Here, Plaintiffs' allegations regarding an agreement between the Manufacturer Defendants fail to set forth a claim pursuant to Section 1 of the Sherman Act. Plaintiffs merely infer the alleged price fixing agreement from the Manufacturer Defendants' rebate payments and the corresponding increases in the price of the Insulin Drugs. (*See generally* ECF No. 112 ¶¶ 120–29.)[7] This, however, particularly when combined with Plaintiffs' allegations that the Manufacturer Defendants compete—rather than conspire—with each other, is not enough to allege an agreement under Section 1. *See Ins. Brokerage*, 618 F.3d at 362 ("[T]he complaint must allege some 'further circumstance,' 'something more than merely parallel behavior,' 'pointing toward a meeting of the minds.' If, in the circumstances alleges, the asserted 'parallel conduct . . . could just

---

[7] Plaintiffs also allege, in a conclusory fashion, "Defendants were members of trade associations, which they used to facilitate their conspiratorial communications and implement their anticompetitive scheme to raise, maintain, and stabilize the prices of the Insulin Drugs." (ECF No. 112 ¶ 130.) Plaintiffs allege that, both before and during the class period, Defendants attended the same press conferences, forums, and meetings and, therefore, must have used these opportunities to plan and carry out their scheme. (*Id.* ¶¶ 133–37.) Plaintiffs, however, provide no further detail on these conferences, forums, and meetings, nor do they allege any facts related to the actual agreements and plans in questions. Without more, the Court is unpersuaded that Plaintiffs' allegations plausibly allege the agreement necessary for a Section 1 claim.

as well be independent action,' then the complaint has failed to plead a § 1 claim." (quoting *Twombly*, 550 U.S. at 557)).

Accordingly, having determined Plaintiffs fail to plausibly allege an agreement to fix the prices of the Insulin Drugs, the Manufacturer Defendants' Motion to Dismiss Count Two of Plaintiff's Amended Complaint is **GRANTED**, and Count Two is **DISMISSED WITHOUT PREJUDICE**.

### C.    Count Three: Conspiracy to Violate the Sherman Act

Count Three of Plaintiffs' Amended Complaint also alleges conspiracy to violate Section 1 of the Sherman Act. (ECF No. 112 ¶¶ 211–22.) Plaintiffs allege Defendants "engaged in an overarching conspiracy to artificially fix, raise, maintain and/or stabilize the prices of the Insulin Drugs" and "entered into . . . a contract, combination, or conspiracy in unreasonable restraint of trade in violation of Section 1 of the Sherman Act." (*Id.* ¶¶ 212–13.) This Court has found Plaintiffs have failed to plausibly allege an agreement between the Manufacturer Defendants to violate Section 1 of the Sherman Act. *See* Section III.B., *supra*. Having reached this conclusion, the Court cannot now find Plaintiffs have plausibly alleged an agreement in which the Manufacturer Defendants and PBM Defendants conspired to fix the prices of the Insulin Drugs. Accordingly, Defendants' Motions to Dismiss Count Three of Plaintiffs' Amended Complaint are **GRANTED**, and Count Three is **DISMISSED WITHOUT PREJUDICE**.

### D.    Count Four: RICO

Count Four of Plaintiffs' Amended Complaint alleges a RICO violation against Defendants. (ECF No. 112 ¶¶ 223–78.) To demonstrate a violation of RICO, a plaintiff must prove:

> (1) the existence of an enterprise affecting interstate commerce; (2) that the defendant was employed by or associated with the enterprise; (3) that the defendant participated . . . , either directly or indirectly, in the conduct or the affairs of the enterprise; and (4) that [the defendant] participated through a pattern of racketeering activity.

*United States v. Irizarry*, 341 F.3d 273, 285 (3d Cir. 2003). Plaintiffs allege "the RICO 'enterprises' [at issue] are associations-in-fact consisting of (a) one of the three PBM Defendants that administers insurance coverage of the Insulin Drugs, including its directors, employees, and agents, and (b) one of the Manufacturer Defendants, including its directors, employees, and agents" (the "Insulin Pricing Enterprises"). (ECF No. 112 ¶ 224; *see also id.* ¶ 225 (further detailing the different combinations of the Insulin Pricing Enterprises).) According to Plaintiffs, "each of the Manufacturer Defendants has exerted control over each Insulin Pricing Enterprise" and "conducted or participated in the conduct of the affairs of those association-in-fact RICO enterprises, directly or indirectly," by:

> a. Controlling the list prices for the Insulin Drugs, which determine the amount of rebates, administrative fees, and other monies each of the PBM Defendants realizes in compensation in exchange for formulary placement;
>
> b. Controlling list prices for the Insulin Drugs and increases thereof that it publicly reports and purports to explain;
>
> c. Controlling the creation and distribution of marketing, sales, and other materials used to inform each of the PBM Defendants of the profit potential of the Insulin Drugs;
>
> d. Promoting the scheme through the U.S. mails, through interstate wire facilities, and through direct contacts with the PBM Defendants;
>
> e. Providing bribes and kickbacks, falsely and misleadingly labeled as rebates or administrative fees, to induce the PBM Defendants to place the Insulin Drugs in a favorable position on the PBM's formulary;
>
> f. Intending that the PBM Defendants would (and did) distribute, through the U.S. mail and interstate wire facilities, promotional and other materials which claimed that rebates lowered drug costs for health benefit provider clients and their plan members; and
>
> g. Publishing and announcing collusive, artificially inflated list price increases and the reasons therefor but concealing that the increases

were to fund the bribes and kickbacks to the PBM Defendants to secure favorable, preferred or exclusive formulary placement.

(*Id.* ¶ 249.) Plaintiffs assert "each of the PBM Defendants has exerted control over each Insulin Pricing Enterprise with which it is associated" and "conducted or participated in the conduct of the affairs of those association-in-fact RICO enterprises by," *inter alia*:

> a. Soliciting and/or obtaining bribes and kickbacks (falsely labeled as rebates, so-called administrative fees, and/or other monies) in exchange for placing the Insulin Drugs in a favorable, preferred or exclusive position on the PBM's formularies;

> b. Misrepresenting and/or concealing from Plaintiffs, Class members, health benefit providers, plan members and the public the existence, amount, and purpose of the rebates, administrative fees and/or other monies from the Manufacturer Defendants;

> c. Misrepresenting and/or concealing from Plaintiffs, Class members, health benefit providers, plan members and the public the effect of the rebates, so-called administrative fees, and/or other monies from the Manufacturer Defendants on the Insulin Drug list prices; and

> d. Publishing, distributing and disseminating materials and information concerning the Insulin Drugs' list prices, net prices and/or the purpose of rebates and fees to perpetuate and conceal the scheme.

(*Id.* ¶ 250.) Finally, Plaintiffs maintain Defendants have committed the following predicate acts: (1) unlawful bribery under the Anti-Kickback Statute, 42 U.S.C. § 1320a-7b(b)(2), (*id.* ¶ 255) and (2) mail and wire fraud in violation of 18 U.S.C. §§ 1341 and 1343 (*id.* ¶¶ 266, 268).

Although not from this District, for its analysis of Count Four, the Court finds the analysis in a recently decided opinion from the United States District Court for the District of Minnesota, *In re EpiPen Direct Purchaser Litigation*, Civ. A. No. 20-827, 2021 WL 147166 (D. Minn.

Jan. 15, 2021), to be instructive and persuasive. In *EpiPen*, wholesaler plaintiffs Rochester[8] and Dakota Drug, Inc. filed suit against the present PBM Defendants and the manufacturers of the EpiPen allergy device. *Id.* at *1. Like the present matter, the *EpiPen* plaintiffs asserted their claims on behalf of themselves and a proposed class of other direct purchasers of the EpiPen device, *id.* at *4, and alleged the defendant manufacturers paid bribes and kickbacks to the PBM Defendants. *Id.* at *1. The *EpiPen* plaintiffs similarly detailed "the basic structure of the prescription-drug market," *id.*, as well as PBM involvement in rebate payments and formulary selections. *Id.* at *2–3. Like the present Plaintiffs, the *EpiPen* plaintiffs alleged, "[r]ather than try to compete . . . , [the defendant manufacturers] began to pay the PBM Defendants increased rebates and other fees. In exchange, the PBM Defendants agreed to maintain the EpiPen's preferred formulary status and to exclude competing [allergy devices]." *Id.* at *3. According to the *EpiPen* plaintiffs, "[t]his cycle of mutual benefit allowed both [the defendant manufacturers] and the PBM Defendants to maintain or increase their profits and . . . resulted in EpiPen prices that were 'artificially inflated.' [The *EpiPen* p]laintiffs, as drug wholesalers who pay the list price for EpiPens, were left to bear the burden." *Id.* at *4.

In *EpiPen*, the PBM Defendants moved to dismiss the plaintiffs' RICO claim. *Id.* Moreover, as discussed below, the PBM Defendants set forth substantially similar arguments in their *EpiPen* moving brief as they do here. For the reasons set forth below, the Court finds no reason to diverge from the *EpiPen* court's sound reasoning, particularly in such a recent case involving similar parties, allegations, and arguments.

---

[8] As stated previously, Rochester brought the original Complaint (ECF No. 1) in this matter and was a consolidated plaintiff until the Court entered an Order of Voluntary Dismissal on November 2, 2020 (ECF No. 111).

### 1.     Predicate Act Arguments

#### a.     Anti-Kickback Statute

In support of dismissal, Defendants[9] set forth several arguments to demonstrate Plaintiffs failed to properly allege a violation of the Anti-Kickback Statute. First, Defendants argue "[n]o court has ever held that the [Anti-Kickback Statute] qualifies as a RICO predicate." (ECF No. 131-1 at 17 (collecting cases).) In this regard, Defendants further note the Anti-Kickback Statute "is not on RICO's [exhaustive] list of predicate acts." (*Id.* (citing 18 U.S.C. § 1961(1)).) Second, Defendants contend Plaintiffs attempt to "end-run RICO's exhaustive list by arguing that an [Anti-Kickback Statute] violation can violate a separate statute, the Travel Act, 18 U.S.C. § 1952, which in turn is itself a predicate act under civil RICO." (*Id.* (citing ECF No. 112 ¶ 255).) According to Defendants, the Travel Act relates, in part, to bribery crimes, while Plaintiffs' allegations concern rebates. (*Id.* at 18.) "Because the [Anti-Kickback Statute] treats rebates and bribes differently, an [Anti-Kickback Statute] claim based on rebates alone cannot serve as a predicate for a Travel Act violation because it is not a violation of a federal bribery law." (*Id.* at 18–19.) Finally, Defendants maintain that, even if the Anti-Kickback Statute could serve as a RICO predicate, Plaintiff has failed to allege an Anti-Kickback Statute violation for two reasons. (*Id.* at 19.) First, Defendants assert the Anti-Kickback Statute "does not reach standard, commercial transactions, such as the rebate agreements challenged here" and, rather, "governs only federal healthcare programs, including Medicaid and Medicare." (*Id.*) Second, Defendants argue the Anti-Kickback Statute, through safe harbor provisions, "exempts the rebate practices at issue here." (*Id.* at 20; *see also id.* at 21–22.)

---

[9] The Manufacturer Defendants incorporate the RICO arguments set forth by the PBM Defendants. (ECF No. 130-1 at 26.) Accordingly, for analysis of Count Four, the Court will consider the parties' arguments together.

The Court adopts the *EpiPen* court's decision on these very issues and rejects Defendants' arguments. In *EpiPen*, the plaintiffs also alleged, *inter alia*, the defendant manufacturers and PBM Defendants violated RICO, alleging as a predicate act the "violation of the federal Travel Act through the violation of the federal Anti-Kickback Statute." *In re EpiPen*, 2021 WL 147166, at *12. The defendant manufacturers set forth nearly identical arguments to Defendants in this action in support of their respective motions to dismiss. *See id.* at *13–15 (arguing (1) plaintiffs' Travel Act allegation was "an improper 'end-run around § 1961(1)' and, effectively, an attempt to sue directly under the [Anti-Kickback Statute]"; (2) plaintiffs "failed to draw a nexus to a federal healthcare program"; and (3) the manufacturers' "payments fell within statutory and regulatory 'safe harbors'"). The *EpiPen* court rejected the defendant manufacturers' arguments in turn.

First, although the *EpiPen* court noted the plaintiffs' "reading of the [Travel Act and Anti-Kickback Statute was] somewhat circuitous, and it is unlikely that Congress would have anticipated it," their theory "seem[ed] plausible as long as a violation of the [Anti-Kickback Statute] counts as 'bribery . . . in violation of the laws of . . . the United States' within the meaning of the Travel Act." *Id.* at *13 (quoting 18 U.S.C. § 1952(b)(i)(2)). The court noted the defendant manufacturers did not "meaningfully challenge[] that proposition" and, accordingly, determined that the plaintiffs' "Travel Act theory at least gets out of the starting gate." *Id.* Here, Defendants do not contend, as the *EpiPen* court discussed, the Anti-Kickback Statute may not amount to bribery under the Travel Act. (*See* ECF No. 131-1 at 18.) Rather, Defendants argue Plaintiffs' claims are based solely upon rebates, which "alone cannot serve as a predicate for a Travel Act violation because it is not a violation of a federal bribery law." (*Id.* at 18–19.) The Amended Complaint, however, is replete with allegations of bribery. (*See generally* ECF No. 112.) Moreover, Defendants' argument that the challenged payments in this action "fall squarely within the definition of a 'rebate'" (*see* ECF No. 131-1 at 18 (defining "rebate" as "any discount the terms

of which *are fixed and disclosed in writing* to the buyer at the time of the initial purchase to which the discount applies, but is not given at time of sale" (quoting 42 C.F.R. § 1001.952(h)(4) (emphasis added)))) is also unavailing, for Plaintiffs maintain they "do not know, and could not know, the details of the financial arrangement between [the] PBM Defendants and Manufacturer Defendants" because the "contracts are closely kept trade secrets" (ECF No. 112 ¶ 89). The Court, therefore, will adopt the *EpiPen* court's decision and "leave the 'bribery' question for another day, should Defendants choose to raise it." *In re EpiPen*, 2021 WL 147166, at *13. Accordingly, at this stage of the litigation, the Court will allow Plaintiffs' Anti-Kickback Statute via Travel Act predicate act proceed.

Second, Defendants argue the Anti-Kickback Statute "does not reach standard, commercial transactions, such as the rebate agreements challenged here," and, instead, "governs only federal healthcare programs, including Medicaid and Medicare." (ECF No. 131-1 at 19.) Defendants maintain "Plaintiffs allege no facts supporting fraud or government programs" save for a single mention of Medicare and Medicaid through a quotation in a "publication that consults for Medicare and Medicaid beneficiaries." (*Id.*) The *EpiPen* court, however, rejected similar arguments. *In re EpiPen*, 2021 WL 147166, at *14 (defendant manufacturers arguing the plaintiffs "failed to draw a nexus to a federal healthcare program because they [did] not allege that any particular rebates led to any particular result with respect to federal healthcare programs" (internal quotation marks and citations omitted)). The court held the defendant manufacturers' arguments "overread[] the statute, which requires only that 'payment *may be made* in whole or in part under a Federal health care program' for the good or service in question." *Id.* (quoting 42 U.S.C. § 1320a-7b(b)(1)(B)). Here, like the plaintiffs in *EpiPen*, Plaintiffs allege (1) the Manufacturer Defendants produce the top-selling insulins in the United States (ECF No. 112 ¶ 49); (2) the PBM Defendants control over 75% of covered lives in the United States (*id.* ¶ 64); and (3) Defendants dominate and control the

entire market for analog insulin (*id.* ¶ 138). As the *EpiPen* court stated, "[t]o be sure, Plaintiffs could have done more to show how Defendants' conduct could jeopardize the public fisc." *In re EpiPen*, 2021 WL 147166, at *14. However, at this stage of the litigation, the Court finds Plaintiffs' allegations, particularly of Defendants' domination and control over the analog insulin market, "make it reasonable to infer that federal health care programs '*may*' pay for [analog insulins], and that is enough." *Id.* (citing 42 U.S.C. § 1320a-7b(b)(1)(B)).

Finally, Defendants assert federal regulations have established several "safe harbors" for "common business arrangements, such as rebates or other payments by drug manufacturers to PBMs," "to ensure that relatively innocuous commercial arrangements would not be caught within the [Anti-Kickback Statute's] broad sweep." (ECF No. 131-1 at 20 (internal quotation marks and citations omitted).) Defendants maintain these safe harbors include a "discounts" safe harbor, 42 C.F.R. § 1001.952(h)(5), and a "group purchasing organization" safe harbor, 42 C.F.R. § 1001.952(j). (*Id.*) Defendants argue the Anti-Kickback Statutes and their safe harbor provisions "exempt[] the rebate practices at issue here." (*Id.*) Once again, however, the *EpiPen* court dealt with nearly identical arguments. *See In re EpiPen*, 2021 WL 147166, at *15. The court first noted the plaintiffs "clearly anticipated a safe-harbor defense when they argued in the [c]omplaint that no safe harbor applies." *Id.* Moreover, the court stated the defendant manufacturers possessed the burden of demonstrating a safe harbor defense, and that "such defenses do not provide a basis for dismissal unless they are apparent on the face of the complaint." *Id.* (citations omitted); *see also Lupian v. Joseph Cory Holdings LLC*, 905 F.3d 127, 130 (3d Cir. 2018). Accordingly, "[g]iven the complexity of the safe-harbor provisions at issue and the relative lack of space devoted to them in the briefing," the *EpiPen* court held "summary judgment [was] a more appropriate procedural device for addressing them." *In re EpiPen*, 2021 WL 147166, at *15 (internal quotation marks and citation omitted). Similarly, here, Plaintiffs have pled no safe harbor provision applies to the

present matter (ECF No. 112 ¶¶ 256, 259–60), and minimal briefing has been set forth for this complex issue (*see generally* ECF No. 131-1 at 20–22). Following the guidance in *EpiPen*, this Court concludes Plaintiffs have plausibly alleged a RICO predicate act pursuant to the Anti-Kickback Statute.

### b.    Mail and Wire Fraud

Defendants also argue Plaintiffs fail to allege mail and wire fraud predicate acts with the heightened specificity required under Rule 9(b). (*Id.* at 22.) Defendants assert "Plaintiffs do not plead a single particularized fraudulent statement by any PBM," (*id.*) and, instead, merely provide generalized, sweeping allegations related to alleged material misrepresentations and omissions related to rebate payments (*id.* at 24). According to Defendants, "[n]o one reading Plaintiffs' [Amended C]omplaint could possibly know what statements Plaintiffs are challenging." (*Id.*)

Once again, the Court finds *EpiPen*, and its nearly analogous factual background, instructive. There, the defendant manufacturers also argued the plaintiffs had "not alleged any false statements or omissions with particularity." *In re EpiPen*, 2021 WL 147166, at *19. The court conceded the plaintiffs' allegations "generally [did] not identify specific dates and times" or set forth facts detailing "a particular false statement made on a particular occasion to a particular client about a particular EpiPen list-price increase." *Id.* (further noting that the pleading deficiency inquiry was "somewhat close").) Nonetheless, the court held the plaintiffs satisfied Rule 9(b)'s heightened pleading because:

> [t]hey allege[d] that the PBM Defendants represented to their clients that their interests would be aligned and that rebates would lower drug costs, and they identify specific marketing statements to that effect. They also allege[d] that [the d]efendants . . . used the mail and interstate wire facilities to transmit thousands of communications to further the scheme.

*Id.* (internal quotation marks and citations omitted). The allegations in Plaintiffs' Amended Complaint are no different. Here, Plaintiffs also allege the PBM Defendants "told clients, potential

clients, and investors that they secured lower [drug] prices" while the "Manufacturer Defendants inflated list prices and funded the bribes and kickbacks in exchange for favorable [formulary] placement." (ECF No. 112 ¶ 246; *see also id.* ¶ 239 ("The PBM Defendants have represented to their respective health benefit provider clients and the public that the rebates lower drug costs when, in fact, . . . the inflated list prices required to fund the bribes and kickbacks to them . . . increased drug costs . . . .").) Moreover, like the *EpiPen* plaintiffs, Plaintiffs here allege "Defendants' use of the U.S. mails and interstate wire facilities to perpetrate the [kickback] scheme involved thousands of communications throughout the Class Period." (*Id.* ¶ 265.) While Plaintiffs' allegations of fraudulent misrepresentations and omissions may not be extensive, the Court nonetheless declines to deviate from the sound judgement of the analogous *EpiPen* decision at this stage of the litigation and, accordingly, finds Plaintiffs have satisfied the requirements of Rule 9(b) as it relates to the mail and wire fraud predicate acts.

### 2. Proximate Cause, Reliance, and Injury Arguments

#### a. Proximate Cause

"[T]o state a claim under civil RICO, the plaintiff is required to show that a RICO predicate offense 'not only was a but for cause of [its] injury, but was the proximate cause as well.'" *Hemi Grp., LLC v. City of New York*, 559 U.S. 1, 9 (2010) (quoting *Holmes v. Sec. Inv'r Prot. Corp.*, 503 U.S. 258, 268 (1992)). If a plaintiff's alleged injuries "could have resulted from factors other than [the defendants'] alleged acts of fraud," there is no proximate causation. *Anza v. Ideal Steel Supply Corp.*, 547 U.S. 451, 459 (2006).

Defendants argue Plaintiffs fail to plausibly allege proximate causation because, under Plaintiffs' theory, "the direct victims of the predicate acts were the PBM [Defendants'] third-party payor clients and insulin consumers." (ECF No. 131-1 at 28.) According to Defendants, "Plaintiffs were harmed only *indirectly* (if at all) when [the Manufacturer Defendants] purportedly raised list

prices to 'fund[] the kickbacks . . . paid to the PBM Defendants.'" (*Id.* at 28–29 (quoting ECF No. 112 ¶ 102).) Because, as Defendants argue, this "causal chain is too attenuated" (*id.* at 29), Plaintiffs' RICO claim cannot proceed (*id.* at 29–30).

Again, the defendant manufacturers in *EpiPen* made the same argument in support of dismissal. *See In re EpiPen*, 2021 WL 147166, at *21. The court, however, rejected the argument despite it being "a somewhat close question." *Id.* According to the court, while it was reasonable to construe the PBM Defendants' clients—and not the wholesaler plaintiffs—as the direct victims of the kickback scheme, *id.*, the plaintiffs had plausibly alleged proximate causation. *Id.* at *22. The court held:

> [The defendant manufacturers'] price increases, at least according to the [c]omplaint, were not just collateral effects of the alleged bribery-and-kickback scheme. Because the EpiPen list price helped determine the amount of [the] unlawful payments to PBMs, raising the list price was itself a means that [the defendant manufacturers] use to carry out the scheme. It is therefore incorrect to say that the alleged RICO violation (a bribery-and-kickback scheme that depended on price increases) was 'entirely distinct' from the cause of [the p]laintiffs' harm (the price increases themselves).

*Id.* (citing *Anza*, 547 U.S. at 458).

Here, Plaintiffs also allege the Manufacturer Defendants increased the list prices of the Insulin Drugs to fund the bribes and kickbacks. (*See, e.g.*, ECF No. 112 ¶ 234 (alleging the "rebates, fees and other payments [were] based on the Manufacturer Defendants' list prices increases and sales volume").) Accordingly, even though this is a "somewhat close question," *In re EpiPen*, 2021 WL 147166, at *21, at this stage of the litigation, the Court finds Plaintiffs have plausibly alleged the proximate causation necessary for a RICO claim.[10]

---

[10] Defendants also argue Plaintiffs fail to plausibly allege proximate causation because Anti-Kickback Statute "violations harm the federal government, and only the federal government has authority to enforce the statute." (ECF No. 131-1 at 28.) Defendants, however, cite to a summary judgment decision explicitly dealing with Medicare and Medicaid kickbacks. (*Id.* (citing *Baglio v.*

  **b.**  **Reliance**

Next, Defendants argue Plaintiffs fail to plead proximate causation for their mail and wire fraud predicate acts because they do not allege anyone relied on the "(yet-to-be-identified) misrepresentations" they assert. (ECF No. 131-1 at 30.) According to Defendants, "Plaintiffs do not even offer a conclusory allegation that they, or anyone else, relied on any purported misrepresentation, never mind plead facts that describe what actions they (or anyone else) took or refrained from taking in reliance on any supposed misrepresentation." (*Id.* at 31.)

"[W]hile first party reliance is not a required element of a civil RICO claim (independently, or as a part of the proximate cause analysis), 'the complete absence of reliance may prevent the plaintiff from establishing proximate cause.'" *Dist. 1199P Health & Welfare Plan v. Janssen, L.P.*, 784 F. Supp. 2d 508, 523–24 (D.N.J. 2011) (quoting *Bridge v. Phoenix Bond & Indem. Co.*, 553 U.S. 639, 658 (2008)). The Court finds Plaintiffs have alleged reliance on the part of the United States government and the PBM Defendants' health benefit provider clients. (ECF No. 112 ¶ 265.) According to Plaintiffs, these parties received written and oral communications from Defendants "that fraudulently misrepresented the reasons for list price increases." (*Id.*) These parties then "deter[red] investigations into the true nature of the list price increases" or decided against making "changes to reimbursement based on something other than list prices." (*Id.*) Although admittedly another close question, the Court declines, at this stage of the litigation, to dismiss Plaintiffs' RICO claim on reliance grounds, particularly, as cases Defendants cite to note, the question "continues to be unsettled law." *Kimmel v. Phelan Hallinan & Schmieg*, 847 F. Supp. 2d 753, 770 (E.D. Pa. 2012) (citation omitted).

---

*Baska*, 940 F. Supp. 819, 834 (W.D. Pa. 1996).) Therefore, at this stage of the litigation, the Court is unpersuaded by this argument.

### c.    Injury

Under RICO, a "plaintiff only has standing if, and can only recover to the extent that, [it] has been injured in [its] business or property by the conduct constituting the violation." *Maio v. Aetna, Inc.*, 221 F.3d 472, 483 (3d Cir. 2000) (quoting 473 U.S. 479, 496 (1985)). Defendants argue Plaintiffs' allegations, taken as true, assert Defendants' "purported scheme led to higher WAC prices." (ECF No. 131-1 at 32.) According to Defendants, "the net effect of [the scheme] is that wholesalers made *more* money as a result." (*Id.*) Because, as Defendants argue, Plaintiffs actually benefitted from the kickback scheme, Plaintiffs have failed to allege a concrete injury and their RICO claim should be dismissed. (*Id.*)

In *EpiPen*, the defendant manufacturers set forth a similar argument. *In re EpiPen*, 2021 WL 147166, at *20 (arguing "[p]laintiffs have not been injured at all because they can resell all of the EpiPens that they purchase . . . and can accordingly recoup any losses they experience from inflated prices"). The court, however, rejected this argument, noting the Supreme Court has held (1) "a buyer seeking overcharge damages is 'equally entitled to damages if he raises the price for his own product'" and (2) "in such cases, 'the possibility that plaintiffs had recouped the overcharges from their customers was . . . irrelevant.'" *Id.* (quoting *Hanover Shoe, Inc. v. United Shoe Mach. Corp.*, 392 U.S. 481, 488–90 (1968)). Once again, the Court declines to deviate from the reasoning set forth in the analogous *EpiPen* decision and finds Plaintiffs have plausibly alleged an injury under RICO.

### 3.    Conduct Argument

A valid RICO enterprise requires "defendants [to] conduct[] or participat[e] in the conduct of the '*enterprise's* affairs,' not just their *own* affairs." *Reves v. Ernst & Young*, 507 U.S. 170, 195 (1993) (quoting 18 U.S.C. § 1962(c)). Defendants argue the two types of activities Plaintiffs allege to demonstrate the PBM Defendants conducted the affairs of a RICO enterprise fail to satisfy the

statute's conduct requirement. (ECF No. 131-1 at 33.) First, Defendants contend the PBM Defendants' solicitation and receipt of bribes and kickbacks is not conduct of the Insulin Pricing Enterprises' affairs because such conduct is in the PBM Defendants' self-interest. (*Id.* at 33–34.) Second, Defendants maintain the PBM Defendants' misrepresentations to their clients and the public is not conduct of the Insulin Pricing Enterprises' affairs because "communicating with clients about rebates is an essential part of the PBM[ Defendants'] business." (*Id.* at 36.) According to Defendants, "[w]hether those communications were true or false (and they were true), they cannot amount to the operation and management of a criminal enterprise." (*Id.*)

The defendant manufacturers in *EpiPen* set forth similar arguments. *See In re EpiPen*, 2021 WL 147166, at *11 ("[T]hey argue that [the defendants] were simply pursuing their own interest within the framework of normal commercial relationships."). The court rejected these arguments, finding the defendant manufacturers "ignore[d] the line [the plaintiffs had] drawn between what they see as legitimate manufacturer PBM interactions and the corrupt[ed] nature of the relationship between [the defendant manufacturers] and the PBM Defendants with respect to the EpiPen." *Id.* at *12 (internal quotation marks and citation omitted). According to the court, the plaintiffs claimed "each of the alleged enterprises deviated from an ordinary commercial relationship—[the defendant manufacturers] by paying bribes in the form of inflated rebates, and each PBM Defendant by accepting the bribes in exchange for abandoning any effort to police EpiPen price increases." *Id.* Importantly, the court noted "bribery is a recognized means of participating in the conduct of an enterprise's affairs," *id.* (collecting cases), and held the plaintiffs had therefore "done enough to allege that the [d]efendants each conducted the affairs of a distinct enterprise." *Id.*

Here, Plaintiffs similarly allege Defendants "engaged in a scheme . . . to corrupt the supply chain by artificially inflating list prices in exchange for preferred formulary placement, shifting the cost of bribes and kickbacks to direct purchasers of the Insulin Drugs." (ECF No. 112 ¶ 273;

*see, e.g.*, *id.* ¶ 100 ("These rebates and fees solicited by the PBM Defendants and paid to them by the Manufacturer Defendants . . . were payments other than for services rendered, *i.e.*, commercial bribes and kickbacks.").) Accordingly, the Court finds Plaintiffs have plausibly alleged conduct of the enterprise's affairs under RICO.

### 4.    Distinct Enterprise Activity Argument

"While the evidence proffered to establish an enterprise and a pattern of racketeering 'may in particular cases coalesce, proof of one does not necessarily establish the other.'" *300 Broadway v. Martin Friedman Assocs., P.C.*, Civ. A. No. 08-5514, 2009 WL 3297558, at *5 (D.N.J. Oct. 13, 2009) (quoting *United States v. Turkette*, 452 U.S. 576, 583 (1981)). "In other words, '[t]he 'enterprise' is not the 'pattern of racketeering activity'; it is an entity separate and apart from the pattern of activity in which it engages." *Id.* (quoting *Turkette*, 452 U.S. at 583); *see also Humphrey v. GlaxoSmithKline PLC*, 905 F.3d 694, 699 (3d Cir. 2018) ("To establish liability pursuant to § 1962(c), a plaintiff must establish the existence of an enterprise that exists separate and apart from the pattern of activity in which [the enterprise] engages." (internal quotation marks and citation omitted)).

Defendants argue the only enterprise relationship alleged in Plaintiffs' Amended Complaint stems from the rebate agreements. (ECF No. 131-1 at 39.) In other words, according to Defendants, "*every* interaction Plaintiffs plead between [Defendants] constitutes some form of racketeering." (*Id.*) Without the racketeering activity, however, there would be no enterprise. (*Id.*) Accordingly, Defendants maintain Plaintiffs have failed to allege the existence of an enterprise separate from the alleged improper conduct. (*Id.* at 38.)

The defendant manufacturers in *EpiPen* set forth a similar argument, asserting "the only alleged relationship between [them] and the PBMs are the unlawful rebate payments—in other words, that no legitimate pursuits tie [the defendant manufacturers] and the PBM Defendants

together as a continuing unit." *In re EpiPen*, 2021 WL 147166, at *10. The court rejected this argument, finding the plaintiffs had "done enough to allege a distinct structure" by claiming the defendant manufacturers paid the PBM Defendants fees for "services not directly relate to the alleged bribery-and-kickback scheme." *Id.* The court held it also seemed plausible that, if the scheme were discontinued, the defendants would "revert to the legitimate business practices that [the p]laintiffs contend they abandoned." *Id.* Accordingly, the court held, "[a]t this stage, [the p]laintiffs' allegations of legitimate business practices [were] enough to show that [the defendant manufacturers] and the PBM Defendants [had] an association beyond the alleged predicate acts." *Id.* (internal quotation marks and citation omitted).

Similarly, here, Plaintiffs allege the Manufacturer Defendants pay the PBM Defendants administrative fees for services other than formulary placement. (*See, e.g.*, ECF No. 112 ¶ 90 (citing an Express Scripts template contract which states the PBM may receive fees for "formulary compliance initiatives, clinical services, therapy management services, education services, medical benefit management services, and the sale of non-patient identifiable claim information").) The Court, therefore, will continue to follow the rationale of the *EpiPen* court and finds Plaintiffs have plausibly alleged an enterprise between Defendants distinct from their alleged activity.

### E.    Count Five: RICO Conspiracy

Count Five alleges a RICO conspiracy against Defendants pursuant to 18 U.S.C. § 1962(d). (ECF No. 112 ¶¶ 279–86.) Defendants argue this claim must fail because Plaintiffs have failed to plead a valid RICO claim under § 1962(c). (ECF No. 131-1 at 40.) However, because the Court has found Plaintiffs have plausibly alleged a RICO violation, Defendants' arguments fail.

### F.    Statute of Limitations

The Manufacturer Defendants also argue Plaintiffs' claims are partially time-barred. (ECF No. 130-1 at 35.) According to the Manufacturer Defendants, Plaintiffs' RICO claims are governed by a four-year statute of limitations.[11] (*Id.* (citing *Agency Holding Corp. v. Malley-Duff & Assocs.*, 483 U.S. 143, 152 (1987); 15 U.S.C. § 15b).) The Manufacturer Defendants, therefore, maintain that "[b]ecause Plaintiffs launched this action on March 31, 2020, the statute of limitations, at a minimum, bars any claim arising from purchases before March 31, 2016." (*Id.*) In opposition, Plaintiffs contend "the statute of limitation was tolled until November 3, 2016, when members of Congress initially asked the Federal Trade Commission and Department of Justice to investigate conduct by Defendants related to insulin." (ECF No. 139 at 68 (citing ECF No. 112 ¶¶ 81, 153, 157).) According to Plaintiffs, "[u]ntil that time, there was no publicly available information that would suggest to Plaintiffs that they might have claims based on Defendants' kickback scheme." (*Id.*) Plaintiffs, therefore, argue that, "[a]s a result of Defendants' fraudulent concealment of their conspiracy and illegal conduct, any applicable statute of limitations affecting the rights of action of Plaintiffs and Class members have been tolled." (*Id.* ¶ 176.)

As Defendants stated, the applicable statute of limitations for a RICO claim is four years. *See Ezell v. JPMorgan Chase Bank Nat'l Assoc.*, Civ. A. No. 18-1407, 2020 WL 525899, at *6 (D.N.J. Jan. 31, 2020) ("Although the RICO statute does not expressly provide a statute of limitations, the Supreme Court, by analogy to the Clayton Act, has established a four-year limitations period for civil RICO claims. (citing *Agency Holding*, 483 U.S. at 156)). "In determining when a RICO claim accrues, the Third Circuit applies the discovery rule, 'whereby a

---

[11] The Manufacturer Defendants also argue Plaintiffs' antitrust claims are partially time-barred. (*Id.*) Because the Court has dismissed Counts One through Three without prejudice, it will only examine the Manufacturer Defendants' statute of limitations arguments as they relate to the remaining RICO claims.

RICO claim accrues when plaintiffs knew or should have known of their injury.'" *Id.* (quoting *Cetel v. Kirwan Fin. Grp., Inc.*, 460 F.3d 494, 507 (3d Cir. 2006)). "A claim does not accrue until a reasonably diligent plaintiff would have discovered the violation." *Id.* (citing *Merck & Co. v. Reynolds*, 559 U.S. 633, 653 (2010)).

"Although a statute of limitations question is an affirmative defense . . . normally raised under Rule 8(c), the statute of limitations may be raised in a Rule 12(b)(6) motion 'where the complaint facially shows noncompliance with the limitations period and the affirmative defense clearly appears on the face of the pleading.'" *Bishop v. Dep't of Homeland Sec.*, Civ. A. No. 14-5244, 2015 WL 2125782, at *4 (D.N.J. May 6, 2015) (quoting *Oshiver v. Levin, Fishbein, Sedran & Berman*, 38 F.3d 1380, 1384 n.1 (3d Cir. 1994)). Here, Defendants argue Plaintiffs "had all the facts they needed to assert their claims more than a decade ago," including (1) public statements and reports from 2009, 2011, 2014, and 2015 that disclosed the Manufacturer Defendants' rebate payments in connection with formulary placement and (2) articles and analyses from 2008, 2009, and 2015 detailing the power and monetary benefits afforded to PBMs through the rebate payment process. (ECF No. 130-1 at 36–37.) According to Defendants, "[t]hese sources refute any suggestion that the Manufacturer Defendants somehow misled Plaintiffs and prevented them from learning the facts underlying their claims." (*Id.* at 37.)

The defendants in *EpiPen* made similar arguments by "point[ing] to articles cited in (and therefore embraced by) the [c]omplaint." *In re EpiPen*, 2021 WL 147166, at *6. "The articles, which were published as early as 2004 and as late as 2015, generally describe[d] the role PBMs play[ed] in the prescription-drug industry and highlight[ed] the risk that a lack of transparency in rebate payments from manufacturers could lead PBMs to favor higher-priced drugs." *Id.* The court, however, rejected the defendants' arguments and held

> Nor are the articles [p]laintiffs cite in their [c]omplaint . . . sufficient by themselves to conclude that [p]laintiffs had a duty to investigate the cause of EpiPen price increases. True enough, the articles might reasonably be understood to provide breadcrumbs that might lead one to investigate the behavior of PBMs and drug manufacturers . . . but it would stretch both the standards governing Rule 12(b)(6) motions and the [c]omplaint's allegations too far to conclude that these sources triggered a duty of reasonable diligence as a matter of law here. The articles were not specific to the EpiPen; they identified general prescription drug market conditions susceptible to potential abuse.

*Id.* The court went on to hold an "opposite conclusion at this stage would have odd consequences: those who might be RICO plaintiffs would be expected to monitor scholarship and like resources and promptly and thoroughly investigate a universe of possible circumstances when presented with any reasoned suggestion that some aspect of the market is susceptible to abuse." *Id.* Here, the Court will follow the *EpiPen* court's sound reasoning and finds dismissal of Plaintiffs' RICO claims based on statute of limitations to be premature. As the *EpiPen* court stated, however, "this is not to say that discovery won't reveal that Plaintiffs' RICO claims are untimely." *Id.*

For the reasons set forth above, the Court finds Plaintiffs have plausibly alleged claims for RICO and RICO conspiracy, and that the affirmative defense of statute of limitations does not clearly appear on the face of the Amended Complaint. Accordingly, Defendants' Motions to Dismiss Counts Four and Five of Plaintiffs' Amended Complaint are **DENIED WITHOUT PREJUDICE**.

### G.    PDC's Claims

Finally, the Manufacturer Defendants argue Plaintiff PDC's claims should be dismissed for two reasons. (ECF No. 130-1 at 39.) First, the Manufacturer Defendants contend "PDC's claims against Defendant [Eli] Lilly must be dismissed because the [Amended] Complaint does not allege that PDC ever purchased any insulin from [Eli] Lilly." (*Id.*) Second, the Manufacturer Defendants assert PDC lacks standing to bring claims against Sanofi and Novo "because PDC has

not alleged any actionable purchase from either Defendant." (*Id.*) According to the Manufacturer Defendants, although the Amended Complaint "vaguely alleges" PDC purchased insulin directly from Novo and Sanofi (*id.* (citing ECF No. 112 ¶ 15)), "it omits any detail about when PDC made those purchases or the prices it paid" (*id.*). The Manufacturer Defendants maintain the explanation for this omission is that PDC never purchased Sanofi or Novo's analog insulins. (*Id.* at 40.)

The Court is unpersuaded by the Manufacturer Defendants' arguments because, as Plaintiffs assert in opposition (ECF No. 139 at 78–79), the Amended Complaint alleges injury in the form of purchases of the Insulin Drugs at artificially inflated prices (*see, e.g.*, ECF No. 112 ¶ 16.) Therefore, even if Plaintiffs fail to allege direct purchases from the Manufacturer Defendants, Plaintiffs have still plausibly alleged injury stemming from the Manufacturer Defendants' conduct. (*See id.* ¶ 103 ("The Manufacturer Defendants improperly inflated the WAC prices of their Insulin Drugs and used the increased monies they received to pay the PBM Defendants the kickbacks."; *id.* ¶ 104 ("When a Manufacturer Defendant enlarges the spread in order to pay higher kickbacks, Plaintiffs and Class members are forced to pay the higher prices.").) Accordingly, the Manufacturer Defendants' Motion to Dismiss PDC's claims is **DENIED**.

## IV.    CONCLUSION

For the reasons set forth above the Manufacturer Defendants' Motion to Dismiss (ECF No. 130) is **GRANTED IN PART and DENIED IN PART**, and the PBM Defendants' Motion to Dismiss (ECF No. 131) is **GRANTED IN PART and DENIED IN PART**. An appropriate order follows.

Date: July 9, 2021

*/s/ Brian R. Martinotti*
**HON. BRIAN R. MARTINOTTI**
**UNITED STATES DISTRICT JUDGE**